I'm John Quartade. I represent the appellants, World Trade Financial and Mr. Michael Adams in Brickell. I'd like to reserve three minutes of my time for rebuttal. All right. I'm here to help you do that. Okay. I can proceed. For a number of decades, there's been a difference between the Securities and Exchange Commission and the brokerage industry about what a broker's obligations are when an unledged certificate walks in the door. The industry's understanding, and we've showed this in a number of ways in our papers that I can get into later, but the industry's understanding pretty much was if the stock has a legend, you treat it as a Rule 144 problem. And every broker had Rule 144 procedures, including World Trade Financial, and they're not under any criticism for that. But if the stock didn't have a legend, the brokers typically relied on the transfer agent and the clearing broker to make sure that it was freely tradable. And that's not illogical to rely on the transfer agent, because the transfer agent is going to be able to trace the chain of that stock and where it came from and, you know, its history, basically. How do you square that position, which I guess if I hear you right, you're basically saying you don't have any additional requirement to investigate. Is that right? That's what the industry's understanding was prior to about six or seven years ago. How do you square that with the cases which go back before six or seven years that basically say you're not supposed to – the broker's not just an order taker. I think that's the language that's used. So how do you square your so-called industry position with way preexisting laws? The SEC's pointed to perhaps three different areas where their views are articulated that you have the sweeping inquiry. The first is these two releases from 62 and 71. It's a legal fantasy to say that any working broker would have been aware of those. Why is that fantasy? They're not paying attention to what the SEC says? Well, Your Honor, there's probably north of 100,000 SEC releases right now, maybe 150. And a working broker relies on its compliance department, which takes direction from FINRA, basically formerly the NASD, to advise them about what your duties and responsibilities are. I mean, is this not a part of the regular training that a broker should get before they're licensed? They do get training, but that training would certainly not have included this area prior to six or seven years ago, because FINRA itself was not really aware of this and focused on it in any way. But the releases are the first. The second are the SEC cases that it decides itself in its judicial capacity. And the third would be those cases that are either appealed to appellate courts or brought in federal courts. I'm just surprised, counsel, to hear you say that they wouldn't pay attention to the 62 and 71 releases, because these are – I'm looking over at the Wansover case, one of the few cases that we have in this area, which is from 2000. So this is now a 13-year-old decision that quotes from the passage and at one point says an off-quoted paragraph of a commission release and then quotes the 62 paragraph. So at least as of 13 years ago, the D.C. Circuit was under the impression that this – that the 62 and 71 provisions had been frequently quoted and cited and used. And this case certainly should have served as notice to the industry, and therefore your clients, that this is what the courts were going to look to and this is what the SEC was going to rely on. So I'm just a little puzzled to hear you say that, gee, it's just one of 100,000 releases. We wouldn't have had time to have studied this and nobody would have talked about it. Okay. Your Honor, to the extent that those releases are, the SEC managed to get them occasionally cited in not only its own opinions, but in like the Wansover case or the Quinn case is another one they really rely on a lot. Those are cases that were egregious on their facts. The brokers typically had actual knowledge that there was an illegal distribution or they were often up to their necks in the underlying fraud. And to the extent a broker would have been aware of those cases, they would have simply thought, yeah, you can't be involved up to your neck in an underlying fraud and an illegal distribution. That hardly takes a law degree or otherwise to figure that out, that if you actually know about the fraud, you can't close your eyes. So those cases really go beyond that, don't they? I think some of the cases that they really stand for, and I'd be interested to hear your perspective, because you rely on industry practice, which I understand. But the cases suggest that if you have an imprudent industry practice, that it can't, in effect, paste over something that's illegal. So how does simply raising the industry practice flag get you to your end game? Well, it has twofold significance, Your Honor. First of all, to the extent we're parsing Section 4.4, which is exempting brokers' transactions, what an ordinary broker's transaction consists of is certainly going to be influenced by industry practice. The second is in connection with the sanctions that I made some fun of the SEC and the defendant for using the word egregious, but if they're not standing out from the herd, it can't be egregious what they did. If they're doing the same thing that everyone else did and have the same understanding that their FINRA examiners have. So your argument there is, even if there's a legal basis for the imposition, that at that stage it can't be egregious until it really is clear that they're somehow outside the pack. Yeah. Your defense is that everybody else is speeding, too. To some extent, they're going the speed limit. I mean, they're going with traffic. It's true. Are the suspensions, have those already taken place? No, Your Honor. So those are suspended, so to speak, pending? No, that's correct, Your Honor. So they've been able to continue their business? Yes, Your Honor. Okay. Counsel, Judge Gould with a question for you, please. Yes, Your Honor. If you were in the D.C. Circuit, would you lose based on their precedent, and are you asking us for the Ninth Circuit to establish a rule that is different from or split from the D.C. Circuit rule, or can you reconcile your position with their rule? Your Honor, if I were in the D.C. Circuit, I would argue that that language as applied to the we'll use the word egregious here, egregious facts of once over, that those references were dicta, basically. They were not essential to its whole recovery. So you'd say their rationale is dicta, and the case doesn't really extend beyond egregious facts? It was totally unnecessary, Your Honor, to reach the issue of what ordinary practice is, whether there's a duty of searching inquiry when the broker has actual knowledge of what's going on. Okay, I see. Thank you. So the SEC finally, I guess, had had enough, and six or seven years ago, I and Furr told FINRA that it needed to mount a program in this area, and FINRA did it by, A, issuing its first release ever in this area, which is Notice to Members 0905. And if you look at that release, typically those releases cite a history of previous releases on the topic, and they amplify, they bring it forward. This is like a virgin birth or from Zeus's forehead or whatever metaphor you prefer. It's new. And the second way FINRA did it was they decided to make some examples, and my clients are one of the examples. But even with FINRA, it's pretty clear what FINRA's understanding was from the lack of previous enforcement cases. I mean, just the complete absence of enforcement cases in this area, except I found one that was, again, basically criminal in nature almost. But that was it. The fact that there's no releases, the fact that their examiners are fine with what my client's doing, and this has been characterized by the SEC as us trying to shift the blame to put our burden on the regulators. That's not the argument. It's not a case where we were getting away with something and we weren't caught and we said, well, you didn't catch us, so it must have been okay. What we're saying is that the reason the FINRA examiners never made an issue of it, with a company whose 75 percent of whose business consists of selling these unlegitimate certificates, and if the court is at all familiar with this process, the FINRA examination is very nitpicking. You never have one of those without a deficiency letter. The reason that was never flagged was that the examiners had the same understanding, that that's what you do. You rely on the transfer agent. So in any event, that's kind of the history of what happened here. As far as the issues in the case, they're mainly what does 404 require of a broker, and secondly, assuming that it requires everything the SEC contends that it requires, are these sanctions appropriate when FINRA and the SEC are basically making law by prosecution? The statute itself simply says that there's an exemption for unsolicited broker's transactions. The duty of inquiry is an SEC loss, basically, which, I mean, there's a long history of it having that view, certainly, that's articulated here, but it's not in the statute. The SEC has never gone through the rulemaking process or anything to try to qualify that exemption. This is simply something that they, as a matter of policy, they think ought to be in the statute. To the extent they have cited that view, we've at some length gone through all their major cases to show what is knowledge or very frequently fraudulent collusion. The SEC basically concedes our characterization of the cases on page 40 of the brief, their reply brief, where they say, well, the principle still applies, even if the cases don't support the principle that it's mentioned in, because it's not necessary to reach the principle. Again, you don't have to ask about what kind of searching inquiry is required when you know that you're involved in an illegal distribution or you know that you're facilitating a fraud. No one would contend that Section 404 is a shield in those circumstances. The question is, what does it require other than the fact that it's an unsolicited broker's transaction? The SEC is essentially writing Section 401 out of the statute. That exemption, in this case, by taking this approach, because making the broker refute any possibility of an underwriter being involved by saying, well, that's your burden because you have the burden of establishing the exemption. But if you had done what might be considered a reasonable investigation, then that wouldn't be an issue, even if you can't be perfect in that investigation, right? There's never a reported case where the SEC deemed that whatever investigation was done was enough. It's always judged in hindsight, Your Honor. And it's always hypothetical in this case. We don't challenge a lot of the history the SEC laid out about the history of these shares, where they came from, who owned them. To the best, we just have no basis to dispute it, but it's not anything that the broker knew. Okay, I understand. Did you want to save your remaining time? Yes, Your Honor. Thank you. May it please the Court, my name is Catherine Broderick, and I represent the Securities Exchange Commission. Brokers have a gatekeeping function to conduct a reasonable investigation into whether a customer's proposed sale of unregistered securities is part of an illegal distribution.  For instance, when a long-term customer brings in 100 shares of a widely traded, well-known stock. But that was not the case here. Here, everything about the proposed transactions was highly suspect. The broker knew that not just one, but three customers opened new accounts at World Trade within the space of six months. All three were employed as stock promoters at the same firm. They received the stock as compensation for services from the companies they promoted. They were using their new accounts to liquidate the stock they received. They were all selling the same stock, which was an unregistered penny stock, which is a notorious vehicle for fraud. The customers deposited large blocks of the stock, totaling $2.3 million within less than a month. The stock was recently issued, and it was a little-known issuer. The presence of all these red flags clearly gave rise to the need for a searching inquiry. Indeed, the red flags presented here are precisely those delineated in the SEC releases as triggering a duty to make a searching inquiry. Yet despite all the red flags, petitioners failed to conduct any investigation whatsoever, even a preliminary one. World Trade admitted that the firm did not conduct any inquiry, and the broker, Brickhell, didn't ask the customers about the source of the securities or determine whether the stock was registered with the SEC or an exemption applied. If the broker had made even a cursory review of the information available on the Internet, he would have discovered that iStorage was described on the pink sheet's website as a development-stage company with little operating history, no earnings, and a negative balance sheet. And it had recently undergone a major repositioning, a reverse merger, a name change, and a forward stock split. Mr. Cortad had made the statement at the conclusion of his argument, something to the effect that, you know, the SEC has never seen an inquiry that it liked, so nothing is ever good enough. And the result of that is that you essentially read that section out of the statute. What is your response to that? The duty to inquire is on a sliding scale. If, you know, it's a well-known stock, then you can easily satisfy that. But when you're confronted with all these red flags, you need to make a showing that you investigated. Well, that doesn't really answer it. What he's saying is, you know, at least based on his understanding of reading the history is, you know, nothing is ever good enough so that really as an absolute matter, the SEC's policy, whether it's this case or other cases, just basically imposes an impossible burden. The only cases, you know, you see are when something is... Amiss, in your view. Right. Yeah, so that's all you see. Because all the rest of the millions of transactions, you know, were either not caught or, you know, they were fine. Counsel, it's Judge Gould. If I could ask a question on SEC's theory here. Would you say that there is a duty of inquiry on every sale by the broker of stock? Yes. They always have to make some inquiry. Yes. But the red flags affect the scope of it. Yes. Or would you say their duty arises only if there is a certain amount of red flags that come before them? Yes, when confronted with red flags, they have to make a further inquiry. So what if they see no red flags? Can they make no inquiry? No, they still have to inquire. They still should know the customer and they should know about the issuer. They need to know basic things. But I thought you just said, you know, if it's General Motors stock, I got the impression they don't have to do anything. Yeah, blue chip stock. But that's a little different. So in answer to Judge Gould's question, there are cases where you don't have to do any inquiry? Or do you have to somehow do something even if it's General Motors stock? Yeah. You should know your customer and know the issuer before you agree to execute the order. And, you know, if it's a long-term customer and you know he has no connection with the issuer, and with the issuer, they should know the business, the financial condition of the company, you know, background information, the executives, and the percentage of shares outstanding so that you can figure out if someone brings in a huge block of stock that would trigger the duty to inquire, you know, how much of the float this customer is selling. To continue, there was no trading history because the market for the stock had just opened and the stock was thinly traded in the OTC market. In fact, the stock certificates on their face indicated that they were issued on November 15th, 2004, and the market for the stock didn't open until December 9th. So therefore, the customers could not have bought the stock in the secondary market because the secondary market did not exist yet. So their stock must have emanated from the issuer or a control person of the issuer or someone in a chain going back to the issuer. Brickwell, Bricknell, admitted that he didn't look at the pink sheets website until after he started selling the ice storage stock. And because the petitioners failed to make the required inquiry, the broker's exemption is not available. We urge the court to affirm the commission's order. Counsel, it's Judge Gould again with another question. Assuming that the panel concludes that the brokerage exemption is defeated by lack of reason and reasonable inquiry, I think that the appellants also raised the issue, there were a couple of them, but one they put a lot of stress on is an argument that the SEC abused its discretion by setting the sanctions that it imposed and that those were excessive and punitive sanctions. So I'd like you to spend a little time addressing the question of the reasonableness of or lack of reasonableness of the sanctions imposed and whether there's an abuse of discretion. The sanctions were in the FINRA guidelines. The size of the firm, you know, it's a small firm, was taken into account. And we were remarking yesterday that the sanctions seemed rather low, and they are commensurate with the circumstances here when they were confronted with so many red flags. I mean, there was nothing about these transactions that wasn't suspect. And counsel brought up the SEC has provided notice to the brokerage community through releases and SEC and FINRA enforcement actions, and the SEC has taken a consistent and well-known approach for 50 years. And as far as the statute, the commission has interpreted the brokers' transactions language in 4.4 to refer only to transactions in securities already distributed to the public, not distributions by issuers and underwriters. So anyone seeking to avoid registration needs to assure themselves or himself that an exemption is available. And so, too, does a broker, a broker has to assure himself that the transaction he's participating in is not a statutory underwriter. The overall picture, you know, Section 5 of the Securities Act of 1933 says that all securities have to be registered. And then under 4.1, if it's an ordinary transaction by an individual investor in the secondary market, that's after the 4.4, one exempts ordinary transactions, you know, unless it's by an issuer, an underwriter, or a control person. So when you get to 4.4, the same applies. The broker has that exempts transactions in the secondary market after the stock has been distributed. If he, if the broker participates in an illegal distribution, he becomes an underwriter. A statutory underwriter. If there are no other questions. I have no other questions. Thank you. Thank you. It says a minute and 17 seconds, but that's a little bit short, so I had to give you a couple minutes. Well, I appreciate the Court's latitude. Just a few quick comments. One, as far as Ms. Broderick mentioned, the date of the certificate being recent, I believe Mr. Brickell testified that he understood that one of the sellers had recently given some shares to two other sellers who were his employees. So if the certificate had been broken up, it would, of course, have a recent date. There's nothing that raises a red flag there. Ms. Broderick's difficulty in trying to articulate when a duty of inquiry kicks in simply reflects the fact that this is an SEC gloss that's kind of made up as you go along and apply it retroactively to facts. It's not in the rule again, or not in the statute. Finally, just one parting thought. The economic reality here is that in a $7 a trade world, no broker can conduct a search and inquiry on a regular basis. It's just not going to happen. What this is really is a way to dry up the trade in paper certificates. And that may be a worthwhile policy goal to do that. I mean, the SEC has been trying to do that since the back office crisis of the 1960s with great success. But I would suggest that this is not the way to do it by selective prosecution in this manner. Thank you, Your Honor. Appreciate the opportunity to be heard.
judges: McKeown, Gould, Bybee